## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

JOSEPH LEON WISE, JR.,

        Plaintiff,

v.                                  Case No:  2:15-cv-386-FtM-CM

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

---

## ORDER

Plaintiff Joseph Leon Wise, Jr. seeks judicial review of the denial of his claim for disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") by the Commissioner of the Social Security Administration ("Commissioner").  The Court has reviewed the record, the briefs and the applicable law.  For the reasons discussed herein, the decision of the Commissioner is **REVERSED** and this matter is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four.

### I.  Issues on Appeal[1]

Plaintiff raises two issues on appeal: (1) whether the Administrative Law Judge ("ALJ") properly evaluated the opinion of Plaintiff's treating orthopedist; and

---

[1] Any issue not raised by Plaintiff on appeal is deemed to be waived. *Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("[A] legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed."), *cited in Sanchez v. Comm'r of Soc. Sec.*, 507 F. App'x 855, 856 n.1 (11th Cir. 2013).

(2) whether substantial evidence supports the ALJ's determination of Plaintiff's residual functional capacity ("RFC").

## II.    Procedural History and Summary of the ALJ's Decision

Plaintiff filed his applications for DIB on March 28, 2011 and for SSI on April 12, 2011.   Tr. 159-71.   Plaintiff's applications allege disability beginning on September 30, 2008.   Tr. 161, 165.   His alleged disability due to three right knee surgeries since October 2008, clinical depression, and fibromyalgia.   Tr. 184.   The claims initially were denied on June 1, 2011 and upon reconsideration on September 9, 2011.   Tr. 84-95, 101-11.   Plaintiff requested and received a hearing before ALJ M. Dwight Evans on June 10, 2013, during which he was represented by an attorney. Tr. 30-71.   As of the date of the hearing, Plaintiff was thirty years old and had completed his twelfth grade education.   Tr. 30.   Plaintiff and Vocational Expert ("VE") Howard Feldman testified at the hearing.   Tr. 31.   The ALJ issued an unfavorable decision on November 15, 2013.   Tr. 12-24.

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2013.   Tr. 14.   At step one, the ALJ concluded that Plaintiff has not engaged in substantial gainful activity since September 30, 2008, the alleged onset date.   *Id.*   At step two, the ALJ found that Plaintiff "has the following severe impairments: right knee pain, status post right knee ACL reconstruction."   *Id.*   At step three, the ALJ concluded that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1

. . . ."  Tr. 16.   Taking into account the effect of Plaintiff's impairments, the ALJ determined that Plaintiff had the RFC to perform a full range of sedentary work,[2] and "is able to lift/carry a maximum of 10 pounds, stand/walk for 2 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday.   [Plaintiff] is precluded from crawling, kneeling, and repetitive squatting. [Plaintiff] has no limitations for use of the hands."  Tr. 17.   Next, the ALJ found that Plaintiff is unable to perform any of his past relevant work as a warehouse worker and school bus driver.  Tr. 22.  At step five, in considering Plaintiff's RFC, age, education, and work experience and relying on the VE testimony, the ALJ found that Plaintiff is capable of performing other work that exists in significant numbers in the national economy, such as receptionist, cashier II, and telephone solicitor.  Tr. 23.  The ALJ concluded that Plaintiff has not been disabled through the date of the decision.  *Id.*  On April 27, 2015, the Appeals Council denied Plaintiff's request for review.  Tr. 1-5. Accordingly, the ALJ's November 15, 2013 decision is the final decision of the Commissioner.  Plaintiff filed an appeal in this Court on June 26, 2015.  Doc. 1. Both parties have consented to the jurisdiction of the United States Magistrate Judge, and this matter is now ripe for review.   Docs. 25-26.

---

[2] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."   20 C.F.R. 404.1567(a), 416.967(a).

### III.    Summary of the Medical Evidence[3]

On September 11, 2008, Plaintiff presented to his treating orthopedist, Dr. Charles P. Springer, M.D., for an orthopedic consultation due to worsening pain in his right knee during the previous several weeks.   Tr. 339.   Plaintiff was pleasant but in obvious discomfort.   *Id.*   He was walking with an antalgic gait favoring the right knee.   *Id.*   The physical examination revealed that Plaintiff had a full range of motion and his ligaments were stable.   *Id.*   He was tender to palpation.   *Id.*   An x-ray report of his right knee showed no abnormality, good alignment, good preservation joint space, and no fracture.   *Id.*   During this visit, Plaintiff received a Cortisone injection and was directed to follow up for a magnetic resonance imaging ("MRI") test.   Tr. 341.

On September 18, 2008, Plaintiff returned for an MRI of the right knee, which revealed that there was a degenerative signal of the medial meniscus, but no tear. Tr. 321.   The medical impression was a minimal sprain of the anterior cruciate ligament ("ACL") and mild chondromalacia of the medial joint compartment.   *Id.*

The following week, on September 25, 2008, Plaintiff returned to Dr. Springer and reported that the Cortisone injection did not help him.   Tr. 342.   The MRI report was relatively unremarkable; there appeared no ligament, meniscal, or articular cartilage damage.   *Id.*   Plaintiff had soft tissue along the lateral parapatellar region which he localized as the source of his pain.   *Id.*   The medical impression was a pathological plica in the right knee.   *Id.*   Dr. Springer recommended injecting that

---

[3] Some of the opinion evidence has been excluded from the summary to avoid redundancy because it will be discussed thoroughly in the analysis of the issues presented.

plica directly.   *Id.*   Patient agreed, and the procedure was done that day.   *Id.*

The following week, on October 2, 2008, Plaintiff returned and reported that the injection only gave him partial relief for a few days.   Tr. 343.   Dr. Springer noted that Plaintiff was using crutches.   *Id.*   Dr. Springer recommended diagnostic arthroscopy with excision of pathologic plica and surgery as needed.   *Id.*

Plaintiff underwent the procedure of right knee arthroscopy, thermal shrinkage of the ACL, and excision of plica on October 8, 2008.   Tr. 323.   Dr. Springer noted that after persistent pain for over a year with little relief from conservative treatment, Plaintiff had made the decision to have the surgery.   *Id.* The postoperative diagnosis was pathologic plica of the right knee, a sprain or stretch of the ACL, and prepatellar bursitis.   *Id.*

During his postoperative visit on October 15, 2008, Dr. Springer noted that Plaintiff was essentially off his medications and he had no postoperative complaints. Tr. 344.   Physical examination revealed Plaintiff had full extension and flexion, and he was healing nicely.   *Id.*   Plaintiff was to continue physical therapy.   *Id.*

On November 17, 2008, Plaintiff returned to Dr. Springer and complained that he still had some pain on his right knee.   Tr. 351.   He was still using a crutch for ambulation.   *Id.*   During this visit, he had a good range of motion but Dr. Springer did note atrophy on the right quadriceps.   *Id.*   Dr. Springer recommended that Plaintiff return to physical therapy to work on quadriceps and hamstring strengthening.   *Id.*

The following month, on December 15, 2008, Plaintiff still reported some pain

on his knee and having to use a crutch for ambulation.   Tr. 352.   Dr. Springer noted some weakness of the quadriceps.   *Id.*   Dr. Springer advised that Plaintiff continue with therapy and gave him a prescription and some samples of Volatren gel.   *Id.*

On January 28, 2009, Plaintiff reported to Dr. Springer with complaints that his knee was buckling on him and that his instability was not improving despite physical therapy.   Tr. 266.   After physical examination, Dr. Springer's impression was that Plaintiff had a partial tear of the ACL of the right knee.   Tr. 266.   Dr. Springer recommended ACL reconstruction.   *Id.*   Plaintiff underwent the procedure on February 18, 2009.   Tr. 259-265, 274-75.   Plaintiff did not return to Dr. Springer until one year later.

On May 14, 2009, Plaintiff presented to his primary care physician, Dr. Peter A. Lewis, M.D., complaining of a cough.   Tr. 289.   At this time, he reported he suffered from anxiety.   *Id.*   He was not taking any medications, although he requested something for the "burning pain" in his leg.   *Id.*   Dr. Lewis noted that Plaintiff had a slow limping gait due to pain in his right knee and was ambulating on crutches.   Tr. 290.   Plaintiff did not return to Dr. Lewis until approximately one year later, on April 1, 2010.   Tr. 287.

Approximately year after his surgery, on February 1, 2010, Plaintiff returned to Dr. Springer with complaints of right knee pain.   Tr. 362.   Physical examination revealed that his knee was "relatively stable;" he had well healed surgical scars, no effusion in the knee, full range of motion, and a 1+ Lachman's with the firm endpoint and a negative pivot knee shift test.   *Id.*   Dr. Springer's examination also revealed

marked quadriceps atrophy, for which Dr. Springer expressed concern. *Id.* Dr. Springer attributed Plaintiff's instability to the atrophy and recommended a complete evaluation of Plaintiff's lumbar spine as well as the peripheral nerves to the right lower extremity, for which he referred Plaintiff to Dr. Allen Tafel. *Id.*

On April 1, 2010, Plaintiff presented to Dr. Lewis complaining of right knee pain that persisted despite wearing a brace and undergoing physical therapy for several months. Tr. 287. Plaintiff reported not feeling much relief since his reconstructive surgery the previous year. *Id.* During this visit, Plaintiff reported being "stressed" about his situation, but denied depression and anxiety. *Id.* General examination showed that Plaintiff had a decrease in the range of motion on his right knee; and he had a limping gait. Tr. 288. Dr. Lewis decided to continue Plaintiff on Tramadol and Ibuprofen. *Id.*

On April 15, 2010, Plaintiff presented to Dr. Springer still reporting persistent pain. Tr. 364. He was "walking with fairly significant antalgia" and wore an ACL brace. *Id.* Dr. Springer noted that the EMG conducted by Dr. Tafel showed no obvious nerve pathology, and Dr. Springer opined that there may be a neurologic component to Plaintiff's persistent pain, such as reflex sympathetic dystrophy. *Id.* Dr. Springer advised Plaintiff continue quadriceps strengthening exercises on his own. *Id.*

The following day, Plaintiff went to Dr. Lewis for a routine physical exam. Tr. 284. He complained of right knee pain. *Id.* Apart from his knee issues, he was feeling "fine" and denied depression or anxiety. *Id.* General examination revealed

that Plaintiff's right thigh showed some atrophy.   *Id.*   His knee brace was in place. *Id.*

On May 21, 2010, Plaintiff presented for an urgent visit with Dr. Lewis due to pain in the right side of his chest.   Tr. 282.   He stated that the pain in his right knee was affecting his sleep.   *Id.*   Dr. Lewis noted that Plaintiff also admitted to feeling "irritable and sad" because of his chronic knee problem.   *Id.*   Plaintiff denied feeling depressed but admitted to having anxiety.   *Id.*   Dr. Lewis' examination revealed that, although Plaintiff had a flat effect and was anxious, he was pleasant and in no apparent distress.   Tr. 283.   Moreover, Plaintiff had normal reflexes and sensation, except for slight strength decrease in the right knee.   *Id.*   Dr. Lewis also noted that there was some muscle asymmetry and some atrophy in the right thigh.   *Id.*   Dr. Lewis prescribed Plaintiff Lexapro, and otherwise continued him on Tramadol and Ibuprofen and directed Plaintiff to follow up in four weeks.   *Id.*

On June 4, 2010, Plaintiff appeared for his follow-up visit with Dr. Lewis.   Tr. 281.   He reported initially feeling "uncomfortable with the Lexapro for the first few days" but then feeling "better."   *Id.*   His sleep and energy level had improved.   *Id.* Although objective examination revealed that Plaintiff had a flat affect, he appeared pleasant, in no apparent distress, and exhibited normal eye contact.   *Id.*   Moreover, his deep tendon reflexes were normal, and he had normal sensation and strength. *Id.*   Dr. Lewis noted that Plaintiff had a brace on his right knee, and he walked with a limp.   *Id.*   Dr. Lewis decided to continue Plaintiff on the same medication regimen. *Id.*

On July 6, 2010, Plaintiff presented to Dr. Lewis for a "mood follow-up."   Tr. 279.   At this visit, he reported feeling "better," and "more motivated."   *Id*.   Plaintiff appeared pleasant but anxious.   Tr. 280.   Physical examination revealed mild edema and decreased range of motion in the right knee.   *Id*.

On September 23, 2010, Plaintiff returned to Dr. Springer for a reevaluation. Tr. 412.   He complained that despite continued home exercises, he still had a lot of knee pain.   *Id*.   Physical examination revealed that he was distally neurovascularly intact.   *Id*.   Dr. Springer noted that Plaintiff moved the knee "quite gingerly."   *Id*. Dr. Springer also noted that Plaintiff had some atrophy of the right quadriceps compared to the left.   *Id*.   Dr. Springer's plan of care was to send Plaintiff for an arthogram MRI to evaluate Plaintiff's ACL graft.   Tr. 412.   This was completed on October 11, 2010.   Tr. 414.   In comparison to Plaintiff's September 18, 2008 arthrogram, Plaintiff had partial tearing of his ACL graft in the right knee.   Tr. 415- 16.   Dr. Springer opined that given Plaintiff's positive pivot shift test and MRI evidence of injury to the graft, Plaintiff's options would be to undergo revision ACL reconstruction or to live with his knee problems and continue the rehabilitation program.   Tr. 417.   Plaintiff decided to go home and think about his options.   *Id*.

The following month, on October 25, 2010, Plaintiff presented to Dr. Lewis with mood concerns and a rash on his left foot.   Tr. 277.   He complained of high stress, low energy, and feeling overwhelmed and depressed.   *Id*.   Dr. Lewis noted that Plaintiff was frustrated by his chronic knee pain and poor response to therapy.   *Id*. Although Plaintiff had a flat affect and his mood was depressed, he denied thoughts

of hurting himself.   *Id.*   He was adequately groomed, in no apparent distress, was pleasant, and had normal eye contact.   *Id.*   Dr. Lewis assessed depression with anxiety and started Plaintiff on Zoloft, in addition to the medications Plaintiff already was taking: Tramadol, Ibuprofen, and Lexapro.   *Id.*

About three months later, in January 20, 2011, Plaintiff returned to Dr. Springer with complaints of knee pain.   Tr. 418.   Dr. Springer's medical impression was ACL laxity post ACL reconstruction and quadriceps atrophy.   *Id.*   Dr. Springer opined that "given that this has been going on for over a year now, I would unequivocally state that this is a permanent injury of unknown etiology."   Tr. 419.

Plaintiff underwent another ACL reconstruction surgery on March 1, 2011. Tr. 425, 579.   During Plaintiff's one week postoperative follow-up, Dr. Springer noted that Plaintiff had started his physical therapy and reported minimal pain.   Tr. 431. Plaintiff's portals and incisions were healed, but he had large effusion present.   *Id.*

During his two-month postoperative follow-up, on May 2, 2011, Plaintiff reported doing much better and that his pain had decreased.   Tr. 430.   Dr. Springer noted Plaintiff was "off narcotics at this point."   *Id.*   Plaintiff was able to perform a straight leg raise, his range of motion was 5 to 120 degrees, and he had a firm endpoint with Lachman's and negative pivot shift.   *Id.*   Distally, he was neurovascularly intact.   *Id.*

Later that month, on May 16, 2011, Plaintiff presented to Dr. Lewis for an evaluation at the request of the Social Security Administration.   Tr. 453.   He complained of high stress, anxiety, sleep disturbances, low energy, and depressed

mood.  *Id.*  Dr. Lewis noted that Plaintiff was "clearly depressed."  *Id.*  Dr. Lewis urged Plaintiff to see a counselor at his church.  Tr. 454. Plaintiff was using crutches and had decreased range of motion and strength in the right knee.  *Id.*

> Also on May 16, 2011, Dr. Springer wrote that Plaintiff was
>
> "progress[ing] nicely in physical therapy. They have reported improved range of motion. Unfortunately, Joe continues to walk with a functional limp and his range of motion is somewhat limited . . . More extensive physical therapy is required for at least another month, perhaps two. . . . I would anticipate a return to light work duty work approximately three months following the procedure with the return to full work as tolerated approximately six to eight months posoperatively.

Tr. 472.

The following month, on June 6, 2011, Plaintiff again presented to Dr. Lewis, with high stress, low energy, and loss of interest in pleasurable activities.  Tr. 534. His gait favored the right leg and he was using a pair of crutches.  *Id.*  Plaintiff had normal sensory and motor reflexes, but decreased range of motion and strength in the right knee.  *Id.*

On June 16, 2011, Dr. Springer completed a Return to Work evaluation.  Tr. 469.  He opined that Plaintiff could perform sedentary work, defined as work that "involves sitting with a small amount of walking."  *Id.*  He opined that in an 8-hour workday, Plaintiff could stand/walk "[a]s tolerated," sit for 5-8 hours, and drive for 1-3 hours.  *Id.*  He further opined that Plaintiff could not bend, twist, squat, climb, reach, or crawl.  *Id.*

On September 8, 2011, medical consultant James Patty, M.D., opined that Plaintiff could lift 50 pounds occasionally, 25 pounds frequently, stand and/or walk

for about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and has an unlimited ability to push and pull.   Tr. 475.   Dr. Patty explained that Plaintiff's post-operative follow up showed small effusion, healed scars, stable right knee, and that Plaintiff was neurovacularly intact.   *Id.*   He noted that Plaintiff is capable of personal care, light household chores and shopping.   *Id.*   Dr. Patty also noted that Plaintiff alleged disability due to fibromyalgia, but it was not documented on the medical evidence of record.   *Id.*

On September 14, 2011, Plaintiff returned to Dr. Springer six months after his surgery for a recheck of his right knee.   Tr. 561.   Dr. Springer noted that Plaintiff had made "good progress" and that, overall, his knee was "more stable than it has been in some time."   *Id.*   Plaintiff was able to ambulate without assistance and denied gross instability.   *Id.*   Physical examination revealed that Plaintiff had good range of motion in the knee, slight tissue swelling, and a well-healed surgical scar. *Id.*   Distally, he was neurovascularly intact.   *Id.*   Dr. Springer gave him another prescription of Tramadol and Dr. Springer recommended that Plaintiff use an ACL brace for high-risk activities.   *Id.*

On September 16, 2011, Dr. Springer completed an Orthopedic Questionnaire, in which he rated Plaintiff's grip strength at 5/5, his leg strength at 4/5, and stated that an assistive device would not be medically necessary for Plaintiff to ambulate independently.   Tr. 483.   He also opined that Plaintiff was capable of performing fine/gross manipulation on a sustained basis.   *Id.*

On November 27, 2011, Plaintiff presented to the emergency room complaining

of pain and swelling in his right knee.   Tr. 531-33.   Physical examination revealed increased pain with flexion but no knee instability.   Tr. 532, 572-73.   The medical impression from a knee x-ray was that he had no joint effusion, previous orthopedic repairs, and some calcification in the lateral view, probably behind the patella.   Tr. 573.   He was placed on a knee immobilizer, his pain medication was adjusted, and he was discharged the same day.   Tr. 531.

The following month, on December 5, 2011 during a visit to Dr. Lewis for complaints of cough congestion and knee pain, Plaintiff complained of severe pain in his right knee.   Tr. 529.   He also complained of depressed mood, low energy, and thoughts of hurting himself when depressed.   *Id*.   He exclaimed, "I am tired of living this way," and "I wish I was dead because I have no money, no job, and I have pain all the time."   *Id*.   He denied any specific plan to hurt himself.   *Id*.   Plaintiff had normal motor, sensation, and strength.   Tr. 529-30.   Plaintiff had a right knee brace in place and his knee was swollen and diffusely tender.   Tr. 531.   Several depression and pain medications were prescribed.   Tr. 530.

Two months later, on February 7, 2012, Plaintiff again visited Dr. Lewis and complained of burning in his ear and right leg, below the knee.   Tr. 527.   Plaintiff had a limping gait, normal cranial nerves II-XII sensory and his motor and deep tendon reflexes were within normal limits.   *Id*.   Plaintiff had a right knee brace in place and his knee was swollen and diffusely tender.   *Id*.   Plaintiff's medications were adjusted.   *Id*.   He continued to take Tramadol for his joint pain and Zoloft for his dysthymia.   Tr. 528.

On May 22, 2012, Plaintiff visited Dr. Lewis for a wellness check-up and reported that his right knee was still bothering him despite medications and physical therapy.   Tr. 524.   He also admitted to depression, high stress, and anxiety.   *Id.* Physical examination revealed that Plaintiff had a flat affect but he was pleasant. Tr. 525.   Plaintiff had normal strength and reflexes bilaterally and normal coordination, but a limping gait.   *Id.*   Dr. Lewis refilled Plaintiff's Tramadol medication, continued him on Lyrica and Zoloft, and instructed him to follow up with his orthopedist.   Tr. 528.   There are no records, however, that Plaintiff followed up with Dr. Springer.

Four months later, on September 24, 2012, Plaintiff presented to Dr. Lewis due to an insect bite and fever.   Tr. 520.   A list of his symptoms included stress, anxiety, and depression.   Tr. 520.   Dr. Lewis noted that Plaintiff had flat affect and looked uncomfortable due to scalp tenderness from the bite.   Tr. 521.   Plaintiff had normal sensation and strength, and his right knee was tender with edema.   Tr. 521.

Two days later, on September 26, 2012, Plaintiff presented to the emergency room because of a fever.   Tr. 518-19, 565-66.   During this visit, his motor strength was 5/5 without focal change.   *Id.*   He did not report any depression, and was awake, alert, pleasant, and conversant.   *Id.*

Plaintiff's next visit to Dr. Lewis occurred the following year, on April 1, 2013 when he presented because of a flu.   Tr. 516-17.   Plaintiff complained of fever and body aches.   Tr. 516.   The medical record does not contain any claimed symptoms of depression, anxiety or knee pain.   *Id.*   Plaintiff's medication list consisted of only

Gabapentin. *Id.* During physical examination, Dr. Lewis noted that Plaintiff had a right knee brace in place, and the right knee was tender with minimal edema. *Id.*

## IV.    Social Security Act Eligibility and Standard of Review

A claimant is entitled to disability benefits when he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months. 20 C.F.R. § 404.1505(a). The Commissioner has established a five-step sequential analysis for evaluating a claim of disability. *See* 20 C.F.R. § 404.1520. The Eleventh Circuit has summarized the five steps as follows:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). The claimant bears the burden of persuasion through step four, and, at step five, the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards and whether the findings are supported by substantial evidence. *Crawford v. Comm'r of Soc. Sec.,* 363 F.3d 1155, 1158 (11th Cir. 2004). The Commissioner's findings of fact are conclusive if supported by

substantial evidence.   42 U.S.C. § 405(g).   Substantial evidence is "more than a scintilla, *i.e.*, evidence that must do more than create a suspicion of the existence of the fact to be established, and such relevant evidence as a reasonable person would accept as adequate to support the conclusion." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (internal citations omitted); *see also Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (finding that "[s]ubstantial evidence is something more than a mere scintilla, but less than a preponderance") (internal citation omitted).   "The district court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." *Foote*, 67 F.3d at 1560; *see also Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating that the court must scrutinize the entire record to determine the reasonableness of the factual findings).

The Eleventh Circuit recently has restated that "[i]n determining whether substantial evidence supports a decision, we give great deference to the ALJ's factfindings." *Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 822 (11th Cir. 2015) (citing *Black Diamond Coal Min. Co. v. Dir., OWCP*, 95 F.3d 1079, 1082 (11th Cir. 1996)).   Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the preponderance of the evidence is against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).   "The district court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." *Foote*, 67 F.3d at 1560;

*see also Lowery*, 979 F.2d at 837 (stating that the court must scrutinize the entire record to determine the reasonableness of the factual findings).   It is the function of the Commissioner, and not the courts, to resolve conflicts in the evidence and to assess the credibility of the witnesses.   *Lacina v. Commissioner*, 2015 WL 1453364, at *2 (11th Cir. 2015) (citing *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971)).

V.   **Discussion**

A.   *Whether the ALJ properly evaluated the opinion of Plaintiff's treating orthopedist, Dr. Charles Springer*

Plaintiff contends that the ALJ failed to give appropriate weight to a January 8, 2012 opinion of Plaintiff's treating orthopedist, Dr. Charles P. Springer, M.D.   Doc. 21 at 17- 21, Tr. 487-91.   Plaintiff argues that the ALJ failed to offer good cause for affording Dr. Springer's opinion little weight.   *Id.*   Because the ALJ gave the January 8, 2012 opinion little weight due to Dr. Springer's reliance, in part, on a functional evaluation that the ALJ deemed likely unreliable, but then gave said evaluation upon which Dr. Springer relied "great weight" in determining Plaintiff's RFC, the Court is unable to determine if the ALJ's decision was supported by substantial evidence.

Under the Social Security regulations, opinions of treating sources usually are given more weight because treating physicians are the most likely to be able to offer detailed opinions of the claimant's impairments as they progressed over time and "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations . . . ." 20 C.F.R. § 404.1527(c)(2).   Medical source opinions may be discounted, however,

when the opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if the opinion is inconsistent with the record as a whole.  SSR 96-2p; *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159-60 (11th Cir. 2004).   If the opinion of a treating physician as to the nature and severity of a claimant's impairment is supported by acceptable medical evidence and is not inconsistent with other substantial evidence of record, the treating physician's opinion is entitled to controlling weight.  SSR 96-2p; 20 C.F.R. § 404.1527(c).  By contrast, if the ALJ does not afford controlling weight to a treating physician's opinion, he must clearly articulate the reasons for doing so.   *Winschel*, 631 F.3d at 1179.

Accordingly, "[a]n ALJ must give a treating physician's opinion substantial weight, unless good cause is shown."   *Castle v. Colvin*, 557 F. App'x 849, 854 (11th Cir. 2014) (citing *Phillips*, 357 F.3d at 1240); *Lewis*, 125 F.3d at 1440; *Sabo v. Chater*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); *Hunter*, 808 F.3d at 822-23.   "Good cause exists when the '(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.'"   *Winschel*, 631 F.3d at 1179 (quoting *Phillips*, 357 F.3d at 1241).   Although the regulations require that the ALJ consider all factors set forth in 20 C.F.R. § 404.1527(c), the ALJ is not required to expressly address each factor so long as he demonstrates good cause to reject the opinion.   *Lawton v. Comm'r of Soc. Sec.*, 431 F. App'x 830, 833 (11th Cir. 2011).

In the Eleventh Circuit, the law is clear that "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel*, 631 F.3d at 1179 (citing *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)) (per curiam). The court reiterated in *Winschel*, "[i]n the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." 631 F.3d at 1179 (citing *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981)). An ALJ who fails to "state with at least some measure of clarity the grounds for his decision" cannot be affirmed because the court cannot perform its duty to "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Winschel*, 631 F.3d at 1179 (citations omitted).

Here, the ALJ discussed the evidence of record, weighed various opinions of treating and consultative sources, and offered some explanation for the weight afforded to the opinions. Tr. 13-22. The ALJ, however, failed to state with at least some measure of clarity the grounds for his decision. Specifically, the ALJ questioned the reliability of an April 2010 functional evaluation, discounted Dr. Springer's January 8, 2012 evaluation for its partial reliance on the April 2010 evaluation, but gave the April 2010 evaluation great weight, yet chose not to adopt Plaintiff's sitting and standing limitations observed during this evaluation. Accordingly, it is not clear to the Court whether good cause existed for the ALJ to discount Dr. Springer's January 8, 2012 decision.

As noted, on June 16, 2011, Dr. Springer opined that Plaintiff could perform

sedentary work, defined as work that "involves sitting with a small amount of walking" and could lift no more than 10 pounds.   Tr. 469.   The ALJ gave this portion of the opinion great weight.   Tr. 21.   Dr. Springer further opined that in an 8-hour workday, Plaintiff could stand/walk "[a]s tolerated," sit for 5-8 hours, drive for 1-3 hours, and could not bend, twist, squat, climb, reach, or crawl.   Tr. 469.   The ALJ gave this portion of the opinion limited weight, finding it was not supported by medical evidence as a whole.   Tr. 21.   Plaintiff does not challenge the weight given to this opinion.   *See*, generally Doc. 21.

With respect to Dr. Springer's January 8, 2012 opinion, the ALJ gave this opinion little weight.   Tr. 21.   On January 8, 2012, Dr. Springer completed medical statements regarding knee problems and chronic pain syndrome, and a residual functional capacity questionnaire.   Tr. 487-91.   Dr. Springer opined that Plaintiff would be able to sit for 4 hours in an 8-hour workday, stand and walk for 0 hours in an 8-hour workday, and would only be able to work while sitting for 4 hours total in an 8-hour workday.   Tr. 489.   In the remarks section of the RFC questionnaire, Dr. Springer merely noted "refer to FCE [functional capacity evaluation] 4/30/10" and then notated "new file done on 7/19/12."   Tr. 491.

The April 2010 functional capacity evaluation to which Dr. Springer referred in his remarks section of the RFC questionnaire was an evaluation completed by Matheson Rehabilitation Services.   Tr. 465-407.   Here, the evaluator observed that Plaintiff could stand no longer than 00:35:19 minutes at a time and 1:28:55 total time, could sit no longer than 00:56:05 at a time and a 2:10:34 total time, and could walk

no longer than 00:19:21 at a time and 00:19:21 total time.   Tr. 399.   The evaluator concluded that Plaintiff was "best suited to the sedentary category of the Physical Demands Characteristics of work chart."   Tr. 367.   He also noted, however, that "considerable question should be drawn to the reliability and accuracy of [Plaintiff's] reports of pain and disability."   *Id.*   He noted that Plaintiff gave low efforts on many of the tests.   *Id.*   He explained, "[t]his could be because the pain limited his ability, however, when we did the grip strength test, he continued to give low effort even though his hands and arms should not be effected by the pain in his leg."   *Id.*   The summary of findings in this evaluation also concluded that "[t]his does draw some question to the reliability of his pain reports."   Tr. 405.

The July 19, 2012 file to which Dr. Springer referred in his remarks section was a functional capacity evaluation completed by Rebecca Loiacano, DPT, of the Lee Memorial Health System Rehabilitation Services.   Tr. 541-53.   She opined that in an eight-hour workday, Plaintiff can stand/walk for 0 hours total at one time and for 0 hours total throughout the day.   Tr. 552.   Plaintiff can sit for 0 hours at one time and four 4 total throughout the day.   *Id.*   During the evaluation, she observed that without crutches, Plaintiff could ambulate five minutes and eleven seconds.   Tr. 543.   Plaintiff demonstrated significant limp in the right knee, occasionally reaching for objects as support.   *Id.*   Plaintiff was able to sit for thirty minutes with his leg extended and was unable to stand for 12 minutes without leaning onto table.   *Id.*

The ALJ afforded little weight to Dr. Springer's January 8, 2012 opinion because

> the medical evidence does not support [the limitations].   For example,
> Dr. Springer opined that in an 8-hour day [Plaintiff] could stand walk
> for 0 hours and sit for 4 hours however he offered no explanation and
> there are no medical records to support this finding. He did remark to
> refer to the functional capacity evaluation performed in April 2010,
> which was previously noted as likely not being an accurate showing of
> [Plaintiff's] abilities due to poor effort.

Tr. 21.   Earlier in his decision, the ALJ discussed the reliability of the April 2010

evaluation in noting that "there is evidence that [Plaintiff] was less than fully

cooperative or put forth less than maximum effort during examinations."   Tr. 20.

Then, the ALJ specifically discussed the July 2012 evaluation and afforded it little

weight as follows:

> [Plaintiff] underwent an additional functional capacity evaluation in
> July 2012. Little weight was given to the findings of the evaluation
> because there is no support for the opinion that claimant could not
> stand/walk in an 8-hour workday. The opinion is inconsistent with other
> physical examinations around this period that showed no effusion and
> full range of motion.

Tr. 19.   Thus, the ALJ specifically addressed each evaluation upon which Dr.

Springer relied either as being unreliable or inconsistent with physical examinations,

and otherwise gave Dr. Springer's opinion little weight because the opined limitations

were not supported by the medical evidence.   Perplexing to the Court, however, is

the fact that the ALJ discounted the April 2010 evaluation as "likely not being an

accurate showing of [Plaintiff's] abilities due to poor effort," (Tr. 21) but in another

portion of his opinion the ALJ gave great weight to the April 2010 evaluation because

"an extensive physical evaluation was performed and the evaluation and other

medical records in the file support the opinion."   Tr. 21.   Nonetheless, the ALJ

determined greater standing and sitting limitations in the RFC than Plaintiff was

observed being able preform during the April 2010 evaluation, leaving the Court to speculate the precise reasons for his RFC determination.   Tr. 17, 399.

The Commissioner argues that the opinion of the state agency medical consultant, Dr. Patty, undermines Plaintiff's allegations and supports the ALJ's findings.   Doc. 24 at 15.   As noted previously, Dr. Patty opined that Plaintiff could stand and/or walk for about 6 hours in an 8-hour workday or sit for about 6 hours in an 8-hour workday.   Tr. 475.   Those are limitations higher than the ALJ's findings. The ALJ, however, did not rely on this opinion, nor did he discuss or weigh it.   The Court finds that, although the ALJ does not need to specifically address every factor considered, he must articulate his opinion with sufficient clarity and specificity for the Court to determine that the decision is rational and supported by substantial evidence.   "The ALJ must state with particularity the weight given to different medical opinions and the reasons therefor."   *Winschel*, 631 F.3d at 1179 (internal citation omitted).

Plaintiff argues that Dr. Springer's opinion also is supported by the report of the consultative examiner, Dr. Eshan Kibria, M.S. M.B.A., D.O.   Doc. 21 at 19.   On April 16, 2013, Plaintiff was referred to Dr. Kibria by the Social Security Administration for a medical examination.   Tr. 493.   The motor examination revealed right quadriceps weakness of 4/5 with no atrophy; right angle dorsiflexion of 4/5 "due to poor efforts and intact TA muscles"; and "remainder [of] 5/5."   Tr. 494. Plaintiff's reflexes were hypoactive but symmetrical, and there were no pathologic reflexes.   *Id.*   Dr. Kibria noted that Plaintiff reported using crutches "on and off for

a year" but observed that the crutches "appeared new." *Id.* He also noted that Plaintiff walked with crutches and claimed that they were prescribed by Dr. Springer, but the record did not support that. Tr. 503.

Dr. Kibria opined that Plaintiff may need crutches or some assistive device to walk beyond 200 feet. *Id.* He opined that Plaintiff could sit for 2 hours, stand for 1 hour, and walk for 1 hour at a time without interruption. Tr. 499. He also opined that in an 8-hour workday, Plaintiff could sit for 4 hours, stand for 1 hour, and walk for 1 hour. *Id.* He opined Plaintiff needs a cane to ambulate. *Id.* He further opined that Plaintiff had limitations with the use of his hands, feet, postural, and environmental limitations. For example, he opined that Plaintiff could only frequently reach, handle, finger, feel, push and pull; could never operate foot control with his right foot due to pain; and could never operate a motor vehicle. Tr. 500. The ALJ gave this opinion little weight because it was "not well support[ed] by the medical evidence as a whole . . . including physical examination and objective diagnostic results." Tr. 21. As further support for his RFC assessment, the ALJ gave great weight to Dr. Springer's orthopedic questionnaire dated September 16, 2011, in which he rated Plaintiff's grip strength at 5/5 and his lower extremity strength at 4/5, because it was "consistent with and supported by medical evidence as a whole." Tr. 21.

Because of the above noted inconsistencies in the ALJ's opinion, the Court cannot conclude that the ALJ met his burden of showing good cause for reducing the January 8, 2012 opinion of Plaintiff's treating orthopedist, Dr. Springer. *See*

*Winschel*, 631 F.3d at 1179 ("when the ALJ fails to state with at least some measure of clarity the grounds for his decision, we will decline to affirm simply because some rationale might have supported the ALJ's conclusion.") (internal quotations and citation omitted).

> B.   *Whether substantial evidence supports the ALJ's determination of Plaintiff's RFC*

Next, Plaintiff argues that the ALJ's determination of Plaintiff's RFC is unsupported by substantial evidence for two additional reasons.   First, Plaintiff contends that the ALJ erred when he failed to account for Plaintiff's need to use an assistive device.   Doc. 21 at 21-22.   Second, Plaintiff contends that the ALJ should have included mental limitations in the RFC assessment.   Doc. 21 at 23-24.

The RFC is the most that a claimant can do despite his limitations.   *See* 20 C.F.R. § 404.1545(a).   At the hearing level, the ALJ has the responsibility of assessing a claimant's RFC.   *See* 20 C.F.R. § 404.1546(c).   The ALJ is required to assess a claimant's RFC based on all of the relevant evidence in the record, including any medical history, daily activities, lay evidence and medical source statements. 20 C.F.R. § 404.1545(a).   The claimant's age, education, work experience, and whether he can return to her past relevant work are considered in determining her RFC, *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1520(f)), and the RFC assessment is based upon all relevant evidence of a claimant's ability to do work despite his impairments.   *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004); *Lewis*, 125 F.3d at 1440 (citing 20 C.F.R. § 404.1545(a)).

The ALJ also is required to consider the combined effects of a claimant's alleged impairments and make specific, well-articulated findings as to the effect of the impairments and whether they result in disability. *Walker v. Bowen*, 826 F.2d 996, 1001 (11th Cir. 1987). The ALJ's RFC assessment must identify and describe the specific medical and nonmedical evidence that supports his conclusion and explain how any material inconsistencies or ambiguities in the record considered and resolved. SSR 96-8p. Thus, the RFC assessment is based upon all relevant evidence of a claimant's ability to do work despite his impairments. *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004); *Lewis*, 125 F.3d at 1440 (citing 20 C.F.R. § 404.1545(a)).

Plaintiff argues that the ALJ should have included Plaintiff's need to use a cane or other assistive device in the RFC because it was medically required. Doc. 21 at 21-22. Social Security Ruling ("SSR") 96-6p states that to determine if an assistive device is medically required, "there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96-6p, 1996 WL 374185, at *7. Plaintiff points Dr. Springer's January 8, 2012 medical statement, in which he commented that Plaintiff has "frequent bursts of chronic pain which require cane/brace to ambulate" and Dr. Kibria's opinion that Plaintiff would need to use a cane for walking more than 200 feet. Tr. 488, 499. Throughout his RFC analysis, the ALJ discussed Plaintiff's use

of crutches, but did not include such a limitation in the RFC.  *See e.g.*, Tr. 20.   In other parts of the opinion, the ALJ noted that Dr. Springer indicated in another opinion that an assistive device is not necessary.   Tr. 17.   The ALJ considered Dr. Kibria's opinion with regard to Plaintiff's need for crutches and also noted that Plaintiff "stated that he used the crutches on and off for a year however, Dr. Kibria noted the crutches appeared new."   Tr. 20.

The Court notes that Dr. Springer's January statement does not state, as required by SSR 96-6p, under what circumstances the brace/cane is required.   In any event, the record does not support a finding that Plaintiff needed to use a cane to the extent that it would preclude him from performing a range of sedentary work, as found by the ALJ.   To the contrary, the VE testified that the use of crutches would not affect sedentary jobs because "a person who is seated can have little to do with crutches."   Tr. 68.   The VE only qualified that statement with "as long as that person could be at their workstation, and there's no reason why a person on crutches would eliminate that, the person would be able to be employed in sedentary-type work."   Tr. 68-69.   Accordingly, the ALJ did not err in failing to account for the need to use an assistive device in the RFC.   Nevertheless, because this matter must be remanded for the reasons outlined above, the ALJ should reconsider whether Plaintiff's RFC calls for the need to use an assistive device.

Plaintiff next argues that the ALJ should have included Plaintiff's mental limitations in the RFC.   Doc. 21 at 23-24.   The ALJ's discussion of Plaintiff's mental limitations in the RFC portion of his opinion is lacking; however he discussed the

evidence in his step two analysis.   Tr. 14-16.   On April 19, 2013, due to limited medical evidence of Plaintiff's mental health treatment, Plaintiff underwent a consultative examination by Cheryl Kasprzak, Psy. D.   Tr. 15, 505-11.   During this examination, Plaintiff denied a history of mental health treatment and denied admission in a behavioral health or mental health facility.   Tr. 506.   Plaintiff stated he suffered from depression, anxiety, and panic attacks since 2008.   Tr. 506.   The mental status examination revealed that Plaintiff's mood and affect were within normal limits.   Tr. 507.   His thought content, thought process, and speech quality were within normal limits.   *Id.*   His psychomotor activity was retarded.   *Id.*   His immediate memory was in the average range, his recent memory was adequate, and his remote memory was within normal limits.   *Id.*   His attention and concentration were within normal limits.   *Id.*

Dr. Kasprzak administered the Wechsler Adult Intelligence Scale Fourth Edition (WAIS-IV) test on Plaintiff and determined that he was functioning in the below average range of intellectual ability, as he obtained a full scale IQ score of 84. Tr. 509.   Dr. Kasprzak's diagnostic impression included pain disorder associated with both psychological factors and chronic pain, anxiety disorder, and panic disorder without agoraphobia.   Tr. 510.   Dr. Kasprzak's prognosis was that Plaintiff was "[g]uarded for employment."   Tr. 510.   She opined that Plaintiff had moderate limitations with ability to understand, remember, and carry out complex instructions, and marked limitation with ability to make judgments on complex work-related decisions.   *Id.*   The ALJ gave this opinion little weight because it was not supported

by Plaintiff's average to normal memory and within-normal-limits finding of attention and concentration.   Tr. 15.   Dr. Kasprzak also opined that Plaintiff had a moderate limitation in responding appropriately to usual work situations and to changes in a routine work setting.   Tr. 513.   As the ALJ noted, however, Plaintiff was pleasant, cooperative, and willing during the evaluation.   Tr. 15.

The ALJ discussed a psychiatric review technique ("PRT") completed by Dr. Thomas L. Clark on May 25, 2011, wherein he opined that Plaintiff had no restriction in activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.   Tr. 465.   He concluded that Plaintiff's mental impairments were not severely limiting.   Tr. 467.   On September 2, 2011, David Clay, PhD. reviewed all the evidence on file and affirmed the Dr. Clark's PRT.   Tr. 473.   The ALJ accorded these opinions great weight because he found they were supported by the totality of the medical evidence.

Plaintiff reported that he can talk on the phone, attend family gatherings, and use the computer.   Tr. 206.   He also reported spending time with others on a daily basis, such as in family events and social gatherings.   Tr. 211.   He denied any impairment in his memory, understanding, following instructions, or ability to get along well with others.   Tr. 212.   He stated that he can follow and read written instructions, but cannot "prepare [them], unless sitting down."   *Id.*   He also reported being able to follow spoken instructions "very well," and denied any attention deficit.   *Id.*

Because this matter must be remanded to the Commissioner for the reasons stated above, the Commissioner is directed to reassess Plaintiff's alleged mental impairments and to consider the combined effects of those impairments and make specific, well-articulated findings as to the effect of the impairments in determining Plaintiff's RFC.

## VI.   Conclusion

Upon review of the record, the undersigned concludes that because the ALJ failed to offer good cause for reducing the January 8, 2012 opinion of Plaintiff's treating orthopedist, Dr. Springer, the Court cannot conclude that Plaintiff's RFC is supported by substantial evidence.

ACCORDINGLY, it is hereby

**ORDERED:**

1.   The decision of the Commissioner is **REVERSED** and this matter is **REMANDED** to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g); for the Commissioner to:

> A.   Sufficiently explain the weight accorded to each of the medical providers and non-examining consultants;
>
> B.   Reassess Plaintiff's alleged mental impairments and to consider the combined effects of a those impairments and make specific, well-articulated findings as to the effect of the impairments in determining Plaintiff's RFC.

2.   The Clerk of Court is directed to enter judgment in favor Plaintiff, Joseph Leon Wise Jr., and close the file.

**DONE** and **ORDERED** in Fort Myers, Florida on this 26th day of September, 2016.

CAROL MIRANDO
United States Magistrate Judge

Copies:
Counsel of record